Filed 10/10/13  In re J.C. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| In re J.C. et al., Persons Coming Under the Juvenile Court Law. | |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>F.H.,<br><br>Defendant and Appellant. | C073249<br><br>(Super. Ct. Nos. JD231434 & JD231435) |

Appellant F.H., the mother of the minors J.C. and D.C., appeals from the juvenile court's orders terminating her parental rights.  (Welf. & Inst. Code, §§ 395, 366.26.)[1]  She contends the juvenile court erred in failing to find the beneficial parent/child relationship exception to adoption.  We affirm.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

BACKGROUND

In March 2011, one-month-old J.C., 15-month-old D.C., and their half sister, 13-year-old S.S., were placed in protective custody by the Sacramento County Department of Health and Human Services (DHHS) following mother's arrest for domestic violence against the minors' father. DHHS filed a dependency petition alleging the domestic violence incident, father's history of substance abuse, and S.S. was previously declared a dependent child based on mother's domestic violence with father. The juvenile court detained the minors in April 2011.

The May 2011 jurisdiction/disposition report related the parents' history of domestic violence in front of the children. The incident leading to the petition involved mother scratching, tackling, punching, and wrestling with father. Father used alcohol and marijuana to the point of intoxication every night, and was a registered drug offender. Mother denied fighting with father, saying, " 'I don't beat men up.' "

S.S. was diagnosed with mental retardation. She told a social worker mother was clever, knowing that since S.S. is dark skinned, she can strangle her without leaving bruising or marks. S.S. was afraid of mother and believed she would be punished for the DHHS intervention when she returned home.

J.C. and D.C. were placed with the paternal grandfather and stepgrandmother (grandparents), with whom they resided since detention. The grandparents reported J.C. was doing well but seemed "flat," neither smiling nor making sounds. At first, D.C. would sit down and not move for a significant time, would not come when asked, and would not smile. She was now smiling and not as flat as she was initially.

DHHS filed an amended petition in June 2011 adding an allegation that mother had hit, choked, and pushed S.S. The juvenile court sustained the amended petition and ordered reunification services for the parents later that month.

The November 2011 report found J.C. was not meeting developmental milestones regarding her motor skills. D.C. was meeting her milestones and had overcome a

2

considerable amount of her shyness since her removal. Mother's visitations went well, and D.C. appeared to experience sadness after visits with either parent. Visitation was increased to two hours twice a month in October 2011.

The juvenile court continued services at the November 2011 six-month review hearing.

The March 2012 report stated mother visits the minors twice a week for four hours. The visits went well and the minors, who were excited to see their mother, enjoyed them. The grandparents reported the minors made significant progress. D.C. displayed some of her prior behaviors, being clingy and fearful, after unsupervised visits started. S.S., who was in a foster home, said she wanted to return to her mother.

A March 2012 addendum report noted that father reported an incident when mother banged on his door and yelled at his girlfriend. Mother left before the girlfriend could call the police, but a neighbor called law enforcement. She admitted visiting father's home but denied doing anything inappropriate. Mother's visitation was changed to supervised as a result of the incident.

Reunification services were continued at the 12-month hearing in the April 2012.

The September 2012 report reported that S.S. was returned to mother. Mother's unsupervised and overnight visits with the minors, which took place two-to-three nights a week, went well. Although mother appeared to have benefitted from services, she had not internalized what she learned. Accordingly, the social worker did not recommend returning the minors.

An emergency response referral was made in September 2012 after D.C. reported that mother hit S.S. S.S. did not want to talk about the allegation when visited by a social worker and the emergency response worker.

The report also related a team decision meeting (TDM) regarding the possible return of the minors to mother's home. Mother failed to address DHHS's concerns, such as childcare resources, a safety network, her desire to keep the minors isolated from

3

extended family members, and her possible financial motivation for wanting the children returned to her care. Instead, mother made numerous allegations against the caretakers and consistently interrupted those who tried to discuss DHHS's concerns. When told the minors made such tremendous progress they would not qualify for supplemental security income (SSI) benefits, mother rolled her eyes and looked away from the speaker. Mother also did not support ongoing contact with the minors' grandparents and said she does not trust them. While mother generally gave the impression of being thoughtful, calm, and reserved throughout the dependency, a social worker observed she could not maintain that persona during the TDM, as her "animosity, anger, and defensiveness did not allow for the productive discussion of her children's safety."

In September 2012, mother's visitation was returned to supervised after D.C. reported to the stepgrandmother that mother hit her and pushed J.C. at their last visit.

An October 2012 addendum report noted that the grandparents wished to adopt the minors.

In September 2012, mother reported to law enforcement that D.C. had been sexually abused by the grandfather, and that both minors were physically abused by the grandparents. A doctor's examination found no signs of sexual or physical abuse on D.C. Mother also called DHHS and reported that the grandparents were making up allegations against her because they were jealous of her and were " 'in it for the money.' " She would prefer the minors were placed with her sister, in a receiving home, or with strangers who would not make reports against her.

At a contested review hearing, mother testified that D.C. told her the grandfather molested her. Although a family service worker arrived to pick up the minors that day, mother did not report the incident or ask the worker to listen to the complaint. She tried to call the hotline to report the incident, but she could not get through and would not wait as she "had things to do." She called law enforcement five or six days later.

4

The juvenile court terminated reunification services and set a section 366.26 hearing. The court found mother's testimony not credible, including her testimony regarding allegations against the grandfather.

In December 2012, mother filed a motion to have her visits supervised by a therapist or counselor. The juvenile court order permitted mother's visits to be observed by a professional.

The February 2013 section 366.26 report stated that mother's supervised visitation was consistent and appropriate. The minors went easily to the visits though neither of them had asked to see mother. J.C. is relatively nonverbal, but D.C. refers to mother by her first name and refers to the stepgrandmother as "Mom" or "Mommy." She has never indicated she missed mother or asked why she did not live with her. The social worker opined that the minors' primary bond is to the grandparents, and there was not a significant bond to mother which would create a barrier for adoption.

In January 2013 an emergency referral followed mother's additional allegations of sexual abuse of D.C. by the grandfather similar to those previously made. The report noted the prior allegations were unfounded, and the reporting party was another family member. The allegations were investigated and deemed unfounded. The investigator also viewed the grandparents as victims of harassment. The grandparents said this would not lessen their resolve to adopt the minors.

At the February 2013 section 366.26 hearing, mother called Chris Joseph, a DHHS family service worker. Joseph had worked for 12 years, and his duties included supervising visits, transporting children, and removing children. He supervised almost all of the minors' visits with mother and provided transportation for them. The minors snuggled with mother on every visit. J.C. called both mother and the stepgrandmother "Mom." D.C. called mother "Mom" or "Mama Tima." Mother was able to calm the minors when they were hurt and upset. She would change their diapers and feed them when appropriate. The minors were generally excited to see her. Most of the time, the

5

minors were upset when the visit ended.  About two times a month D.C. would express her desire to go home with mother at the end of a visit.

The juvenile court found the beneficial parent/child exception to adoption did not apply and terminated parental rights.

DISCUSSION

Mother contends the juvenile court erred in not applying the beneficial parent/child relationship exception to adoption.  We disagree.

At a hearing under section 366.26, if the juvenile court finds by clear and convincing evidence that a minor is likely to be adopted, the court must terminate parental rights and order the minor placed for adoption unless "[t]he court finds a compelling reason for determining that termination would be detrimental" due to one of the statutorily enumerated exceptions.  (§ 366.26, subd. (c)(1)(B).)

The parent has the burden of establishing an exception to termination of parental rights.  (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.)  "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement."  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*).)

When the juvenile court rejects an exception to adoption, we review the court's finding deferentially.  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [whether standard of review deemed substantial evidence or abuse of discretion, broad deference to lower court required]; *Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351 [abuse of discretion]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*) [substantial evidence].)

Section 366.26, subdivision (c)(1)(B)(i) provides an exception to adoption when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  However, a parent may not claim this exception "simply by demonstrating some benefit to the child from a continued

6

relationship with the parent, or some detriment from termination of parental rights." (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1349.) The benefit to the child must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Mother correctly notes she regularly visited her children. She claims the "most compelling" evidence of the minors' relationship with her was Joseph's testimony, which established the minors' referred to her as "Mom" and generally appeared comfortable with her on visits. According to mother, Joseph's testimony also shows she could comfort the minors and exhibited proper parenting. Mother also relies on Joseph's testimony showing the minors would get upset at the end of visits, and D.C. sometimes wanted to go home with her.

The minors were one month and 15 months old when placed into protective custody in March 2011. When parental rights were terminated nearly two years later, in February 2013, the minors spent more than half their young lives apart from mother. Being taken from mother at such a young age and spending so much of their life apart from her presents a considerable obstacle to establishing the beneficial parent/child relationship exception.

Consistent, positive visitation and some evidence of attachment to mother does not overcome this obstacle. While Joseph's testimony provides some evidence of a bond with mother, the section 366.26 report noted that D.C. addressed mother by her first name and called the stepgrandmother her mother. The report also noted D.C. did not ask for

7

mother between visits, and concluded the minors' primary attachment was to the grandparents while their bond with mother would not be a significant impediment to adoption. Also, mother's relationship with the minors was not always beneficial, as she tried to sabotage the minors' relationship with their caretakers and potential adoptive parents through false allegations of physical and sexual abuse.

Mother has not established either the necessary beneficial relationship or that invoking the exception to adoption was in the minors' best interests. The juvenile court's decision to decline to impose the exception and to terminate parental rights was not in error.

DISPOSITION

The juvenile court's orders are affirmed.

                                  BLEASE             , J.

We concur:

       RAYE            , P. J.

       HULL            , J.